(23 Misc. Rep. 341.)

### FELDMAN v. O'BRIEN.

(Supreme Court, Appellate Term. April 27, 1898.)

REAL-ESTATE AGENT—RIGHT TO COMMISSION.

> The defendant, an owner of certain houses, employed two rival brokers to sell them, each of whom attempted to effect a sale to a Mrs. R. It was found by the jury that she was originally introduced to defendant by plaintiff's assignor, one of the brokers; but he never succeeded in effecting a meeting of minds at the figure of $6,400, which was the lowest defendant ever authorized him to sell for. While he was still negotiating, the other broker bought the property himself, at a lower figure, with the intention, which was realized, of ultimately selling to Mrs. R. at an advance. Each of the brokers knew throughout that the other was attempting to effect a sale. No time had been fixed during which plaintiff's assignor might sell at $6,400. Held, that defendant was not bound for any particular period, and that her sale at a less sum did not render her liable for commissions to plaintiff's assignor.

Appeal from Eleventh district court.

Action by Leo A. Feldman against Mary J. O'Brien. From a judgment on a verdict in favor of plaintiff, defendant appeals. Reversed.

Argued before BEEKMAN, P. J., and GILDERSLEEVE and GIEGERICH, JJ.

Ronald K. Brown, for appellant.

Davis & Gordon, for respondent.

GILDERSLEEVE, J. In the spring of 1897 the defendant was the owner of three houses in this city, to wit, Nos. 2002, 2004, and 2006 Bathgate avenue. About the month of April, 1897, defendant's husband, J. J. O'Brien, acting as her agent, put these houses into the hands of Brooker & Dunn, real-estate brokers, for sale. Some months afterwards, O'Brien, as defendant's agent, also put the property for sale into the hands of the plaintiff's assignor, Edward Polak, who was also a real-estate broker. About the middle of October, 1897, according to the testimony of Polak's clerk and of plaintiff, a certain Mrs. Riker called upon Polak, and said she wanted to invest some money in real estate. Polak, or his representative, showed her a number of houses, which she does not seem

to have liked; and "around October 18th or 20th," according to the testimony of plaintiff, or on November 11th, as appears by defendant's Exhibit 4, Polak, or his representative, showed her the houses in question of defendant, with which she was pleased. Polak communicated with O'Brien, who demanded $6,800 a piece for the three houses, which the said Mrs. Riker refused to give. Afterwards O'Brien agreed to accept $6,400 for each house, but the best offer that Mrs. Riker ever made to Polak was $6,000, which O'Brien refused to accept. About November 1, 1897, Mrs. Riker called on Brooker & Dunn, to see what they had to sell. They gave her a list of houses, including the ones in question, and sent her to look at them. The evidence fairly establishes the fact that at about this time, or shortly afterwards, and before any definite arrangements had been made, each of these two brokers, Polak and Brooker, knew that the property was also in the hands of the other for sale; and O'Brien swears that he said to each of them that he would give the commission to the one who obtained the best price for the property, in which he seems to be corroborated by Brooker, so far as the latter is concerned, and is not specifically contradicted by Polak. Mrs. Riker swears that she told both of the brokers that she would buy from the one who could get the houses for her at the lowest figure. Polak, however, when first on the stand, swears thus: "So he [O'Brien] made me a proposition that he would not allow the property to go to anybody before he had notified me that he would make a reduction in the price; but he said that that [$6,400] would be the lowest." Subsequent to the giving of this testimony, O'Brien is called to the stand, and, in reply thereto, swears that Polak said, "O'Brien, I will expect you to give me a fair show;" to which he (O'Brien) replied, "There is no favor; whoever gets the most money for the houses will get the commission." Although Polak is again called to the stand, he does not contradict this testimony of O'Brien. Long and active negotiations went on between the defendant's agent, Mrs. Riker, and the two rival brokers. Polak swears that the lowest offer that he got from O'Brien to sell was $6,400, while the evidence shows that the highest offer he ever got to buy from Mrs. Riker, or anybody else, was $6,000; and he says he kept going from the one to the other, trying to get O'Brien to lower his offer to sell and Mrs. Riker to raise her offer to buy, but he was not successful in bringing about a meeting of minds, or any satisfactory result. In the meanwhile his rival, Brooker, was also running back and forth between O'Brien and Mrs. Riker, and he finally did succeed in getting her to raise her offer to $6,100 a house. O'Brien, however, declined this offer, saying that he would have to pay broker's fees out of it, and that there would not be enough left to satisfy him. Finally, Brooker offered to buy all of the three houses himself at $6,150 each, and charge O'Brien only $50 a house as broker's fees for his firm of Brooker & Dunn; so that defendant would receive net for each house $6,100. He frankly confessed that he hoped to be able to transfer the property to Mrs. Riker for $6,150 a house, as she had already offered $6,100; and he said he would run the chance of her refusing.

After some hesitation, O'Brien accepted this offer, and closed the bargain. Brooker paid down a deposit on the transaction, and a contract of sale was made. Then Brooker visited Mrs. Riker, and, after some further negotiation, persuaded her to give $18,450 for the three houses, or $6,150 apiece. He thereupon assigned his contract to her, and on November 30, 1897, a deed of the property from defendant to Mrs. Riker was duly executed. Plaintiff claims that his assignor, Polak, procured Mrs. Riker as a purchaser, and that he is entitled to his commission of 1 per cent. on the purchase price paid by Mrs. Riker to defendant. The court charged the jury in these words, viz.:

"I do not think it necessary, as I address an intelligent jury, to rehearse particularly the evidence that has been introduced here. You must remember that it is necessary for the plaintiff to show by a preponderance of proof that he was, or his assignor was, the procuring cause of this sale. If you believe that, the plaintiff here is entitled to a verdict at your hands. The amount that you will find will be one per cent. of the purchase price, which has been shown to be $18,450."

Upon this charge, the jury brought in a verdict in plaintiff's favor for $184.50.

Although the testimony seems somewhat contradictory and uncertain as to which of the brokers first brought Mrs. Riker into business relations with the defendant's agent in respect to this property, we will accept the verdict of the jury as establishing this fact in favor of Polak. We are of opinion, however, that the evidence will not sustain the finding of the jury that Polak was the procuring cause of the sale, or that plaintiff is entitled to the commission. It seems fairly established, from all the evidence, that it was an open contest between these two brokers as to which should first bring the parties to an understanding and agreement; and when the principal employs two brokers the one effects the sale who brings the minds of the parties to meet. See Smith v. McGovern, 65 N. Y. 575. The mere fact that Polak first introduced Mrs. Riker to O'Brien does not entitle him to his commission; for where a broker fails to bring his employer and a proposed purchaser to an agreement he is not entitled to commissions because of the fact that a sale is subsequently made to the person introduced by him, in the absence of proof of bad faith on the part of the vendor. See Baker v. Thomas, 12 Misc. Rep. 432, 33 N. Y. Supp. 613. In the case at bar the evidence will not warrant a finding that O'Brien acted in bad faith. The negotiations between Polak and the two parties O'Brien and Mrs. Riker were productive of no mutual assent to terms upon the part of the individuals concerned, and it is clearly established that the sale, as finally brought about, was after the completion of negotiations through a broker other than Polak. See Baker v. Thomas, supra. All that Polak was entitled to, under his employment, as shown by his own testimony, was a reasonable opportunity to find a purchaser at $6,400 a house; and, after he had failed to do so, defendant was at liberty to sell for less, without becoming liable to him for commissions. See Satterthwaite v. Vreeland, 3 Hun, 154, quoted with approval in Sibbald v. Iron Co., 83 N. Y. 385. No time was fixed or designated during which Polak was authorized to sell at $6,400 a house, so that the defendant, as owner, was bound for no par-

ticular period of time; and for that reason she was not prevented from making a bona fide sale of the houses at a less sum, without incurring any liability for commissions to Polak. See Satterthwaite v. Vreeland, 3 Hun, 154. In the case of Sibbald v. Iron Co., 83 N. Y. 383, the court of appeals (Finch, J.) use the following language, viz.:

"It follows as a necessary deduction from the established rule that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That is the plain contract and contemplation of the parties. * * * If the principal acts in good faith, not seeking to escape the payment of commissions, but moved fairly by a view of his own interest, he has the absolute right, before a bargain is made, while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor."

See, also, Wylie v. Bank, 61 N. Y. 415, and Gerding v. Haskin, 141 N. Y. 519, 36 N. E. 601.

In the case at bar there does not seem to have been any formal revocation of Polak's authority or employment until after defendant had made her contract of sale to Brooker. But this fact is of no importance, since at the time of such revocation no bargain, through Polak, had been made. Polak's negotiations remained unsuccessful, and the commissions had not been earned. Defendant, therefore, acting in good faith, had an absolute right to revoke Polak's authority without incurring any liability for commissions. See Sibbald v. Iron Co., supra. It is true that if, in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might be said that the due performance of his obligation by the broker was purposely prevented by the principal. See Sibbald v. Iron Co. But the evidence before us does not disclose any such state of facts in the case at bar. Accepting the testimony of Polak as to his employment by defendant, it in no manner abridged or restrained her own right to sell, unless Polak should sell for the price he was authorized to receive, under the terms of his employment, viz. $6,400 for each house. Polak confesses, as we have seen, that he tried to bring about a meeting of minds, seeking to induce Mrs. Riker to raise her offer of $6,000, which was the highest offer he ever obtained, and endeavoring to persuade O'Brien to lower his offer to sell at $6,400 but that his efforts were not successful. By making a sale for $6,400 a house, within a reasonable time, Polak would have become entitled to his commissions; but, as he failed to do that, no right to the commissions was created. See Satterthwaite v. Vreeland, supra.

For the reasons above set forth, the judgment appealed from should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.